MAVIS GILPIN, Petitioner, *v.* LOWELL GILPIN, Respondent.

Domestic Relations Court of the City of New York, Family Court, Kings County, February 2, 1950.

*John P. McGrath, Corporation Counsel* (*E. Madeline Arcese* of counsel); for petitioner.

*Frederick Posses* for respondent.

I. Montefiore Levy, J. This case is without precedent in our court.

In September, 1942, petitioner married Christos Morai-topoules in Kingston, British West Indies; without bothering to divorce him or to make a more than perfunctory investigation as to whether he was still living (which in fact he was), petitioner elected to decide that he was dead and in 1945 coolly and boldly married Lowell Gilpin, the respondent. In the marriage license application she falsely alleged that she was unmarried.

This marriage, therefore, was absolutely void and bigamistic. (*McCullen* v. *McCullen,* 162 App. Div. 599.)

The respondent is under no duty to support petitioner as she is not his wife. But she is pregnant and requests hospitalization for the *unborn* child, the parenthood of which the respondent denies.

After the child's birth, a blood test then might determine the child's paternity.

Though the marriage is void, the child will still be a legitimate child.

Subdivision 6 of section 101 of the New York City Domestic Relations Court Act provides: "A child born of parents who at any time prior or subsequent to the birth of said child shall have entered into a *ceremonial* marriage shall be deemed the legitimate child of both parents for all purposes of this act regardless of the validity of such marriage." (Italics supplied.)

While the petitioner is in her fifth month of pregnancy, the respondent claims to have lived separate from her for eleven months. This she denies.

If the spouses engaged in sexual intercourse during the critical period the presumption of legitimacy can with difficulty be overcome. There is a strong legal presumption that the child is his.

Subdivision 1 of section 101 of the New York City Domestic Relations Court Act provides: "A husband is * * * chargeable with the support of his * * * *children* * * * if possessed of sufficient means * * *." (Italics supplied.)

The question presented therefore is: Is the offspring though still within the mother deemed presently a child?

An unborn child in the fifth month of pregnancy is definitely formed in features and its constituents. It is a common occurrence to have a child born in seven months, and for such a child to progress as well as a child born in nine months. The delicacy of the child born in the seventh month makes it a greater problem but if it survives it usually does not suffer from having been born prematurely.

To indicate a recognition of a child's creation before its actual delivery from the mother's womb, it may be noted that in an old civilization like China the age of the child commences in the earliest possible stages of pregnancy so that at the date of its actual birth it is deemed to be one year old.

It is often an important question both in civil and criminal cases as to when birth is completed.

It determines the distinction between the crimes of foeticide and infanticide. The former, the destruction of the life of the foetus; infanticide, the felonious taking of the life of a newborn child. The killing of a foetus *in utero,* is manslaughter; the killing of a child after its birth is murder. (*Dupree* v. *Dupree,* 45 N. C. 164.)

Provision for the child would be incomplete which neglected the mother during the prenatal period. Her physical well-being is inseparably connected with the child until it is born. It well includes the child *en ventre sa mere.*

In most instances, people are eager to take care of their offspring before and after birth. In fact, Blackstone well stated, "Providence has taken more effectual care of this problem than any laws by implanting in the breast of every parent a natural and insuperable affection which not even the deformity of person or mind, not even the wickedness, ingratitude, and rebellion of children, can totally suppress or extinguish." It is a rare case, such as this, when the responsibility is challenged.

But it must be acknowledged that often children are conceived and born by parents who feel little responsibility for their welfare. In such instances, the parents should be appropriately treated but the children, whether legitimate or illegitimate, are innocent victims and deserve our sympathy and our support. It saddens one's heart to note the frequent neglect of such children. What would happen to them if they were not helped by the community through its welfare department, by religious leaders, by the many social agencies and the Big Brother and Big Sister organizations. One shudders at the possible picture.

While the paternity is fraught with uncertainty, I give to the child the benefit of the doubt so that it will receive better care.

After all, the husband did marry the mother even if he was deceived.

When the child is born the respondent will have the privilege of a blood test to determine his parenthood.

Since Karl Landsteiner's discovery of the four blood groups (1901) thousands of articles have been published on that subject. But a competent pathologist, however, will not perform the test on an infant less than one month old.

The Court of Special Sessions of the City of New York accepts as final the positive result of a blood test excluding paternity around which the proper safeguards have been drawn. (N. Y. City Crim. Cts. Act, § 67; N. Y. City Dom. Rel. Ct. Act, § 34.)

In this respect we differ from a finding in a recent California case involving a noted star.

Sidney Schatkin on page 203 of his most admirable book on "Disputed Paternity Proceedings" (2d ed.) says of that verdict, "The Chaplin verdict is contrary to science, nature and truth." This court agrees with him.

Respondent is directed to pay the sum of $150 for hospitalization and medical expenses in connection with the child's birth.